UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
AT LAW AND IN ADMIRALTY

---

UNITED STATES OF AMERICA,

Plaintiff,

v. Case No.

ALL SECURITIES IN WEALTHFRONT
ACCOUNT NUMBER 8W14BX2M,

Defendant.

---

**VERIFIED COMPLAINT FOR CIVIL FORFEITURE IN REM**

---

The United States of America, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Elizabeth M. Monfils, Assistant United States Attorney for this district, alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

**Nature of the Action**

1. This is a civil action to forfeit property to the United States of America, under 18 U.S.C. § 981(a)(1)(A) and 21 U.S.C. § 881(a)(6), for violations of 18 U.S.C. §§ 1956 and 1957 and 21 U.S.C. §§ 841(a)(1), 841(h), 843(c)(2)(A), and 846.

**The Defendant In Rem**

2. The defendant property is all securities in Wealthfront account number 8W14BX2M held in the name of Karan Gupta.

3. On December 8, 2023, the United States obtained seizure warrant 23-M-511, issued by United States Magistrate Judge Stephen C. Dries in the Eastern District of Wisconsin, to seize

up to $83,941.95 in United States currency from Wealthfront investment account number ending in 6673 ("Wealthfront 6673").

4. On or about December 8, 2023, seizure warrant 23-M-511 was served on Wealthfront in Palo Alto, California. Wealthfront then transferred securities valued at approximately $83,941.95 in United States currency from Wealthfront 6673 to a newly created segregated account, Wealthfront account 8W14BX2M, held in the name of Karan Gupta. No other securities or other funds are being held in Wealthfront account 8W14BX2M.

5. Wealthfront has maintained custody of the defendant property in Wealthfront account 8W14BX2M and is holding the defendant property pending an order of forfeiture.

**Jurisdiction and Venue**

6. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

7. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

8. Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(1) because the acts or omissions giving rise to the forfeiture occurred, at least in part, in this district.

**Basis for Forfeiture**

9. The defendant property, all securities in Wealthfront account number 8W14BX2M, is subject to forfeiture under 21 U.S.C. § 881(a)(6) because it:

A. represents proceeds of distribution of controlled substances and a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and

B. represents proceeds of distribution of controlled substances by means of the Internet and a conspiracy to deliver, distribute, or dispense controlled

substances by means of the Internet, in violation of 21 U.S.C. §§ 841(h), 843(c)(2)(A), and 846.

10. The defendant property, all securities in Wealthfront account number 8W14BX2M, is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A) because it was involved in, or is traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957.

**Statutory background**

11. The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 amended the Controlled Substances Act to address online pharmacies, codified at 21 U.S.C. § 829. No controlled substance that is a prescription drug, as determined by the Federal Food, Drug and Cosmetic Act, may be delivered, distributed, or dispensed by means of the Internet without a valid prescription, as required by 21 C.F.R. § 1306.09(a).

12. According to 21 U.S.C. § 829(e)(2),

    A. The term "valid prescription" means a prescription that is issued for a legitimate medical purpose in the usual course of professional practice by –

        i. a practitioner who has conducted at least one in-person medical evaluation of the patient; or

        ii. a covering practitioner.

    B. The term "in-person medical evaluation" means a medical evaluation that is conducted with the patient in the physical presence of the practitioner, without regard to whether portions of the evaluation are conducted by other health professionals.

    C. The term "covering practitioner" means, with respect to the patient, a practitioner who conducts a medical evaluation (other than an in-person medical evaluation) at the request of a practitioner who –

        i. has conducted at least one in-person medical evaluation of the patient or an evaluation of the patient through the practice of telemedicine, within the previous 24 months; and

ii. is temporarily unavailable to conduct the evaluation of the patient.

13. The Ryan Haight Online Pharmacy Consumer Protection Act of 2008 also added new provisions to prevent the illegal distribution of controlled substances by means of the Internet, including registration requirements of online pharmacies, Internet pharmacy website disclosure information requirements, and prescription reporting requirements for online pharmacies.

**Facts**

14. Heroin is a Schedule I controlled substance.

15. P-Fluorofentanyl is a Schedule I controlled substance.

16. Adderall is a Schedule II controlled substance.

17. Codeine is a Schedule II controlled substance.

18. Hydrocodone is a Schedule II controlled substance.

19. Methamphetamine is a Schedule II controlled substance.

20. Oxycodone is a Schedule II controlled substance.

21. Tapentadol is a Schedule II controlled substance.

22. Ketamine is a Schedule III controlled substance.

23. Alprazolam is a Schedule IV controlled substance.

24. Carisoprodol is a Schedule IV controlled substance.

25. Diazepam is a Schedule IV controlled substance.

26. Modafinil is a Schedule IV controlled substance.

27. Tramadol is a Schedule IV controlled substance.

28. Zolpidem is a Schedule IV controlled substance.

**Investigation of Online Pharmacies Distributing Controlled Substances Without Valid Prescriptions**

29. Agents and task force officers with the Milwaukee District Office of the Drug Enforcement Administration ("DEA") have been investigating online pharmacies that advertise both controlled and non-controlled pharmaceuticals for sale without requiring a prescription.

30. DEA's investigation identified one such drug trafficking organization ("DTO") that operated an illegal online pharmacy website, www.pill2days.com ("PILL2DAYS"), which included a large network of drug shippers and payment processors.

31. According to DEA records, PILL2DAYS was not a registered online pharmacy.

32. Members of the PILL2DAYS DTO included, among others, Karan Gupta and individuals having the initials M.P., H.G., and C.G.

A. M.P. and C.G. received bulk drug parcels, reshipped the drugs to customers throughout the United States, and collected drug payments from customers before transferring the drug proceeds to those running the online pharmacy.

B. The drug proceeds were laundered through financial accounts held by Karan Gupta and H.G.

C. Based on the investigation, agents traced approximately $83,941.95 in drug proceeds transferred from various sources into Wealthfront investment account ending in 6673 held in the name of Karan Gupta.

**Co-conspirators identified as "SOI-1" and "SOI-2"**

33. Agents identified a network of co-conspirators involved in the PILL2DAYS DTO, including one co-conspirator based in Florida ("SOI-1") and another based in Texas ("SOI-2").

34. SOI-1 and SOI-2 received bulk shipments of controlled pharmaceuticals from overseas and reshipped them to customers throughout the United States.

35.     From about July 2019 through August 2020, undercover agents had purchased controlled pharmaceuticals numerous times from SOI-1 and SOI-2, without providing valid prescriptions.[1]

36.     In August 2020, agents executed search warrants at the residences of SOI-1 and SOI-2 and seized, among other things, electronic devices and documents containing evidence identifying drug suppliers and customers, along with communications related to the sale of controlled substances and money laundering of drug proceeds.

37.     SOI-1 identified PILL2DAYS from which SOI-1 had purchased Xanax (Alprazolam) and suspected Adderall in the summer of 2020. SOI-1 communicated with the website representative via email. Those emails showed discussions about controlled substances being shipped from overseas to the United States, controlled substances being shipped domestically from re-shippers located in the United States, and prices and quantities of controlled substances.

38.     SOI-2 sent customers' drug payments to the PILL2DAYS online pharmacy. SOI-2 communicated with a website representative via telephone at a phone number known to be used by the online pharmacy.

39.     SOI-1 and SOI-2 were told by PILL2DAYS representatives that PILL2DAYS ships pharmaceuticals from overseas to U.S. customers at the advertised prices on its website. At a significantly higher price, U.S. customers can receive the drug parcels from domestic re-shippers that PILL2DAYS had established.

---

[1] Analysis of these pharmaceuticals by the DEA laboratory identified controlled substances including heroin, methamphetamine, ketamine, tramadol, diazepam, alprazolam, and modafinil.

40. In August 2020, agents intercepted and seized a parcel sent from PILL2DAYS to SOI-2. That parcel had contained approximately 364 tablets of modafinil and had been shipped by a re-shipper in Vermont.

41. Financial records show that SOI-1 and SOI-2 sent payments for Xanax and Adderall purchases to bank accounts used by the DTO to process customer payments.

**Undercover buys of controlled substances from PILL2DAYS without prescriptions**

42. According to PILL2DAYS' online pharmacy website, www.pill2days.com, in December 2020 the pharmacy offered the following controlled substances for sale:

A. Adderall – a Schedule II controlled substance,

B. Phentermine – a Schedule IV controlled substance,

C. Diazepam – a Schedule IV controlled substance,

D. Ativan – a Schedule IV controlled substance,

E. Klonopin – a Schedule IV controlled substance,

F. Xanax – a Schedule IV controlled substance,

G. Ambien – a Schedule IV controlled substance,

H. Soma (carisoprodol) – a Schedule IV controlled substance, and

I. Tramadol – a Schedule IV controlled substance.

43. Beginning in December 2020, agents conducted multiple undercover purchases of controlled substances—without prescriptions—from PILL2DAYS, including tramadol, tapentadol, purported oxycodone, purported hydrocodone, purported Adderall, codeine, zolpidem, and Xanax (alprazolam).

44. While conducting undercover buys from PILL2DAYS, agents received the drug parcels from M.P. in Corona, California and from C.G. in Zephyrhills, Florida.

45.     M.P., C.G., and another DTO co-conspirator ("SOI-3") also received drug payments from PILL2DAYS customers.

**Co-conspirator identified as "SOI-3"**

46.     In December 2020, the Federal Bureau of Investigation executed a search warrant at the home of SOI-3 for SOI-3's role in money laundering drug proceeds for the PILL2DAYS DTO.

47.     DEA agents learned shortly after SOI-3's arrest that SOI-3 also received drug payments on behalf of PILL2DAYS, including a direct payment from an undercover agent.

48.      In January 2021, agents interviewed SOI-3 about SOI-3's role with PILL2DAYS, and SOI-3 admitted the following:

      A.     SOI-3 worked in the import/export business and began processing drug payments for the owner of the Indian-based PILL2DAYS call center in 2015 or 2016.

      B.     SOI-3 met with the call center owner twice in India and identified the owner by name and photograph.

      C.     SOI-3 did not initially know the payments were for drugs being distributed in the United States, but eventually found out and spoke with the owner about it.

      D.     SOI-3 knew that PILL2DAYS was receiving approximately $60,000 to $70,000 per month in drug sales, via credit card, bank wires, electronic checks, physical checks being mailed, PayPal, Zelle, and Venmo.

      E.     SOI-3 normally sent the drug proceeds to the call center owner's Indian bank account, "Ample Telecommunications Pvt. Ltd."

      F.     SOI-3 also regularly transferred drug proceeds to the Argentine national who created and operated the online pharmacy website. This Argentine national controlled bank accounts under the names "Bliss Artecrafts, LLC," Universalnick, LLC," and others.

**Additional undercover buys of controlled substances from PILL2DAYS without prescriptions**

49. On June 2, 2022, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed on its website. Agents purchased approximately 180 tablets of purported Adderall and approximately 90 tablets of purported oxycodone without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a bank transfer of $1,000.00 by Zelle to Citi Bank account #0104, via Zelle details email address praveXXXXX@hotmail.com and name H.G.[2]

B. Agents received a shipment of approximately 183 tablets of purported Adderall and approximately 104 tablets of purported oxycodone in the same parcel.

C. DEA laboratory analysis of those medications identified the presence of approximately 72.271 grams mixture of p-Fluorofentanyl in the purported Adderall tablets and approximately 9.7 grams mixture of p-Fluorofentanyl in the purported oxycodone tablets.

D. The drug parcel containing the purported Adderall and purported oxycodone tablets had been shipped to agents by M.P.

50. On July 12, 2022, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed on its website. Agents purchased approximately 270 tablets of purported Adderall and approximately 180 tablets of purported tapentadol without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a bank transfer of $1,450.00 by Zelle to an account controlled by a co-conspirator.

B. Agents received shipments of approximately 217 tablets of purported Adderall and approximately 190 tablets of purported tapentadol in separate parcels from different shippers.

C. DEA laboratory analysis of those medications identified the presence of approximately 84.3 grams mixture of p-Fluorofentanyl in the purported Adderall tablets, and tapentadol in the purported tapentadol tablets.

[2] Throughout this complaint, certain information has been redacted using the letter "X" as a means of avoiding the revelation of any personal information.

D. The drug parcel containing the purported Adderall tablets had been shipped to agents by M.P.

51. On August 25, 2022, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed on its website. Agents purchased approximately 180 tablets of purported Adderall and approximately 180 tablets of purported tapentadol without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a bank transfer of $1,100.00 by Zelle to Citi Bank account #0104, via Zelle details email address praveXXXXX@hotmail.com and name H.G.

B. Agents received approximately 180 tablets of purported Adderall, split into two 90 tablet parcels, and approximately 180 tablets of purported tapentadol. All three parcels were shipped by different shippers.

C. The first parcel containing approximately 90 tablets of purported Adderall had been shipped to agents by a shipper in Columbia, South Carolina. This shipper was later arrested by other federal agents, and controlled pharmaceuticals had been seized. DEA laboratory analysis identified the presence of only acetaminophen in the purported Adderall tablets.

D. The second parcel containing approximately 180 tablets of purported tapentadol had been shipped to agents by C.G. from Zephyrhills, Florida. DEA laboratory analysis identified the presence of tapentadol.

E. The third parcel containing approximately 90 tablets of purported Adderall had been shipped to agents by M.P. from Corona, California. DEA laboratory analysis identified the presence of only acetaminophen in the purported Adderall tablets. Mixed in with these 90 tablets of counterfeit Adderall tablets was one round pink tablet that agents recognized as tramadol. Subsequent laboratory analysis confirmed the presence of tramadol in that single tablet.

**Records analysis**

52. In or about September 2022, telephone account records for the telephone number listed on PILL2DAYS' online pharmacy website—which was the same phone number the

undercover agent communicated with regarding drug purchases and drug payments—show the source of funds for this telephone number was M.P. with an address in Corona, California.

    A.    Records also show that telephone number (310) 985-8XXX was in regular communication with PILL2DAYS' online pharmacy telephone number.

    B.    Based on their investigation, agents know that the PILL2DAYS DTO had previously solicited drug shippers or payments processors to fund expenses such as this telephone account.

53.    In or about September 2022, telephone records for phone number (310) 985-8XXX show the subscriber was M.P. in California.

    A.    The phone tolls show this phone number had been in regular communication with PILL2DAYS' online pharmacy phone number and had received text message alerts from the U.S. Postal Service, PayPal, CashApp, Safepass One Time Password, Google, SquareCash, and Bank of America. These types of alerts are consistent with processing online pharmacy drug payments.

    B.    Records show that M.P. had been in communication with PILL2DAYS approximately 4,336 times between June 7, 2022, and January 18, 2023.

54.    According to United States Postal Service records, between November 15, 2021, and August 19, 2022, four parcels had been shipped to M.P.'s address in Corona, California from an address in Zephyrhills, Florida. Based on the investigation, agents believe that the four parcels were all drug parcels shipped by C.G., who is a drug shipper operating in and near Zephyrhills, Florida, for the PILL2DAYS DTO.

55.    In October 2022, Zelle records for M.P.'s two Zelle accounts show the accounts were linked to phone number (310) 985-8XXX. Incoming and outgoing transactions showed transfers to H.G., C.G., and other Zelle accounts to which PILL2DAYS had directed the undercover agents to send past drug payments. Records also showed that several of the drug payments had the purpose of the transaction concealed by making notes such as "web design," "web site optimization," and "business subcontract."

56.     According to telephone records through mid-August 2023 for phone number (310) 985-8XXX used by online pharmacy PILL2DAYS to take drug orders and coordinate drug shipments and payments, M.P. remained listed as the source of funds. Text message conversations were with customers discussing drug orders, drug payments, and drug shipments. Conversations were also with drug shippers such as M.P.  Information from text message conversations included, but is not limited to, the following:

A.     On April 8, 2022, M.P. was asked to begin receiving bulk drug parcels on behalf of PILL2DAYS and to reship the drugs to customers of the online pharmacy.  M.P. agreed and said that he had created the fictitious business, "Calisun," and had obtained a post office box at 2279 Eagle Glen Parkway in Corona, California for this purpose.  These bulk parcels contained up to 50,000 tablets per parcel. Types of scheduled drugs that M.P. received to reship included Adderall, oxycodone, hydrocodone, tapentadol, Ambien, Ativan, and tramadol.

B.     M.P. also received tens of thousands of dollars in drug payments from customers and then transferred those funds to accounts controlled by PILL2DAYS. Customers were directed to send drug payments to a Venmo account in the name of M.P., a CashApp account controlled by M.P., or a Zelle account linked to M.P.'s cell phone number. M.P. also received checks in the mail to deposit into M.P.'s Bank of America account.

C.     M.P. was asked to receive greater amounts of money.  M.P. admitted that M.P. was laundering money and that they needed to keep the amounts below $9,999 to avoid detection by the Internal Revenue Service. At one point, M.P. stated that M.P. had too much drugs in M.P.'s possession to be laundering money for free. M.P. then started getting paid a percentage of the drug payments that M.P. laundered, in addition to being paid for each parcel shipped.

D.     On June 14, 2022, M.P. said that M.P. was opening a Stamps.com account and would be managing all future drug parcels with Stamps.com. Based on their investigation, agents know that it was around this time that the undercover drug parcels switched from cash paid postage to Stamps.com paid postage.

E.     M.P. and PILL2DAYS customers were regularly directed to send drug payments via Zelle to multiple accounts, including to praveXXXXX@hotmail.com (H.G.).

F.      PILL2DAYS customers were regularly directed to send drug payments via CashApp to $liveteXXXXX (M.S./Cloud 18/H.G.).

G.      Multiple PILL2DAYS customers were directed to mail checks to M.P. that were made out to P.C.  Each check was written for thousands of dollars.

H.      M.P. received numerous checks in the mail from PILL2DAYS to deposit and occasionally transfer to H.G.

I.      PILL2DAYS customers were directed to send drug payments to a PayPal account belonging to an individual having the initials S.T.

J.      PILL2DAYS customers were directed to send drug payments to C.G. and to return damaged drug products to C.G. in Florida.

K.      PILL2DAYS customers were directed to send drug payments via CashApp to $liveteXXXXX (M.S./Cloud 18/H.G.) and via Zelle to purvika_chauXXXXX@yahoo.in and praveXXXXX@hotmail.com (H.G.).

L.      PILL2DAYS customers were directed to send drug payments to PayPal account gupta.XXXXX@gmail.com (T.G.).

M.      PILL2DAYS customers purchasing drugs were advised that their credit card payment to a PayPal account would show the transactions on their bank statements as "Autowright, LLC" or "MSOFT Services" to disguise the purchase of drugs.

57.     U.S. Customs and Border Protection ("CBP") records show that the following parcels being shipped to M.P.'s address in Corona, California had been seized by CBP:

A.      Entry date of November 9, 2022 – CBP in Cleveland, Ohio seized a parcel shipped from the United Kingdom containing approximately 3.46 kilograms of alprazolam.

B.      Entry date of August 28, 2021 – CBP at JFK airport in New York seized a parcel shipped from India containing approximately 280 grams of tapentadol.

C.      Entry date of July 18, 2021 – CBP at JFK airport in New York seized a parcel shipped from India containing approximately 348 grams of tapentadol.

D. Entry date of October 12, 2020 – CBP at JFK airport in New York seized a parcel shipped from India containing approximately 550 grams of carisoprodol.

**Additional undercover buys of controlled substances from PILL2DAYS without prescriptions**

58. On November 1, 2022, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed its website. Agents purchased approximately 90 tablets of purported Adderall, approximately 180 tablets of purported tapentadol, approximately 180 tablets of purported oxycodone 30mg, and approximately 60 tablets of purported oxycodone 10mg without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a bank transfer of $1,450.00 by Zelle to Citi Bank account #0104, via Zelle details email address praveXXXXX@hotmail.com and name H.G.

B. Agents received the purchased drugs in three parcels. Two parcels from M.P. contained the Adderall and oxycodone, and one parcel from a shipper in Bronx, New York contained the tapentadol.

C. DEA laboratory analysis of those medications showed that approximately 109 tablets of purported Adderall received from M.P. contained approximately 41.247 grams mixture of p-Fluorofentanyl. The approximately 165 tablets of purported oxycodone 30mg and approximately 60 tablets of purported oxycodone 10mg received from M.P. all contained only acetaminophen. The analysis of the approximately 180 tablets of tapentadol from New York confirmed the presence of tapentadol.

59. On February 17, 2023, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed on its website. Agents purchased approximately 90 tablets of purported Adderall and approximately 180 tablets of purported tapentadol without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a Bitcoin payment to Bitcoin address ending in Q1zYzWg.

B. Agents received the purported Adderall and purported tapentadol in two separate parcels.

C. DEA laboratory analysis of those medications revealed the purported Adderall was found to contain only acetaminophen and the tapentadol analysis is pending.

D. The drug parcel containing the purported Adderall tablets had been shipped to agents by M.P. The drug parcel containing the purported tapentadol tablets had been shipped to agents from a shipper in Illinois.

60. On April 17, 2023, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed on its website. Agents purchased approximately 90 tablets of purported Adderall and approximately 90 tablets of purported oxycodone without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a Bitcoin payment to Bitcoin address ending in Q1zYzWg.

B. Agents received the purported Adderall and purported oxycodone in two separate parcels.

C. DEA laboratory analysis of the purported oxycodone identified the presence of approximately 10.9 grams of a mixture of methamphetamine, p-Fluorofentanyl, and xylazine. DEA laboratory analysis of the purported Adderall identified the presence of approximately 36.814 grams of a mixture of p-Fluorofentanyl, caffeine, and acetaminophen.

D. The drug parcel containing the purported Adderall tablets had been shipped to agents by M.P. The drug parcel containing the purported oxycodone tablets had been shipped to agents from a shipper in New York.

61. On June 22, 2023, agents conducted an undercover purchase from PILL2DAYS, via text message at a phone number listed on its website. Agents purchased approximately 60 tablets of purported Adderall, approximately 90 tablets of purported oxycodone, and approximately 30 tablets of zolpidem without prescriptions.

A. To pay for the drugs, agents were directed via text message to conduct a Bitcoin payment to Bitcoin address ending in Q1zYzWg.

B. Agents received all three of the purchased drugs in three separate parcels from three different domestic shippers.

C. DEA laboratory analysis of those medications showed the purported Adderall contained only caffeine, the purported zolpidem contained approximately 16.709 grams of alprazolam, and the purported oxycodone contained approximately 12.2 grams of a mixture of p-Fluorofentanyl, fentanyl, and methamphetamine.

D. The drug parcel containing the purported Adderall tablets had been shipped to agents from a shipper in Florida. The drug parcel containing the purported oxycodone had been shipped to agents from a shipper in New York. The drug parcel containing the purported zolpidem had been shipped to agents by M.P.

62. According to Stamps.com records for the account that M.P. used to ship parcels, M.P. shipped approximately 825 suspected drug parcels between August 21, 2022, and June 21, 2023.

63. C.G. shipped drug parcels via United States Postal Service ("USPS") self-serve kiosks. Navy Federal Credit Union records pertaining to C.G.'s financial accounts showed transactions at USPS self-serve kiosks in Zephyrhills, Florida, from which C.G. had shipped a drug parcel to a Milwaukee undercover agent and from which C.G. had shipped parcels to M.P. Records also showed Zelle transactions between C.G. and M.P., as well as deposits into C.G.'s account from H.G.

64. Based on the investigation, agents know that H.G. had received at least tens of thousands of dollars in drug payments from PILL2DAYS customers and M.P.

65. Furthermore, based on the investigation, agents believe the Zelle transactions from H.G. to C.G. were payments from PILL2DAYS to C.G. for supplying drugs to the PILL2DAYS DTO.

**August 16, 2023 Mirandized Statement of M.P. following execution of search warrant at M.P.'s residence in California**

66. On August 16, 2023, agents executed a search warrant at the residence of M.P. in Corona, California.

67. During the search, agents found approximately 125,000 tablets of purported Adderall, oxycodone, tapentadol, Soma (carisoprodol), alprazolam, tramadol, and zolpidem. These drugs were located in an office/music studio and the garage. Agents also found shipping materials, packaging materials, a quantity of methamphetamine, personal use quantity of controlled steroids, and three firearms.

68. On August 16, 2023, agents conducted an interview of M.P. Prior to conducting the interview, an agent read M.P. his constitutional *Miranda* rights. M.P. stated that he understood each of his rights and was willing to speak with agents.

69. During the interview, M.P. stated, among other things, the following:

   A. M.P. began as a PILL2DAYS customer in approximately 2019. In 2020, M.P. was solicited to start receiving bulk drug parcels, reship drugs to PILL2DAYS customers, receive customer drug payments, and transfer the drug payments to various accounts held by PILL2DAYS.

   B. Some of the drug types that M.P. shipped were Soma (carisoprodol), zolpidem, tapentadol, Adderall, oxycodone, hydrocodone, tramadol, and Xanax (alprazolam).

   C. M.P. estimated that M.P. had shipped 800 or more drug parcels for PILL2DAYS and that each parcel averaged between 100 and 150 pills.

   D. M.P. rented two third-party mailboxes at mail stores for the purpose of receiving drug parcels, but PILL2DAYS nearly always had the drug parcels shipped to M.P.'s residence in Corona, California. M.P. packaged the drugs for reshipping to customers, printed shipping labels, and stored the drugs at his residence.

   E. PILL2DAYS customers who were unhappy with their received drug orders were regularly directed to ship the drugs to M.P. at his residence in Corona, California.

F.   M.P. admitted that several bulk drug parcels in transit to him at his residence in Corona, California had been seized by CBP.

G.   M.P. received personal checks, cashier's checks, and money orders in the mail at his residence in Corona, California for drug payments from PILL2DAYS customers. These checks were each for thousands of dollars. M.P. deposited these funds into one of M.P.'s personal bank accounts and then transferred the funds to various bank accounts, as directed by PILL2DAYS. A substantial amount of the drug proceeds was transferred to accounts in the name of H.G.

H.   M.P. was compensated for shipping drug parcels, receiving customer drug payments, and laundering funds received from checks in the mail.

**Tracing of drug payments made by PILL2DAYS customers**

70.   Agents conducted a financial investigation to trace drug payments made by PILL2DAYS customers. Many of these drug payments were made to accounts controlled by M.P., who was then directed to transfer the funds to PILL2DAYS' financial accounts.

71.   Prior to M.P. becoming a co-conspirator for the PILL2DAYS DTO, undercover agents and other customers were directed to send drug payments, via Zelle, to bank accounts linked to email addresses XXXX@vigordose.com (A.A.) and absolutedigitXXXXX@gmail.com (Entire Solutions, LLC). Records show that M.P. began receiving customers' drug payments and transferring the drug proceeds to these same Zelle accounts.

72.   In approximately November 2021, PILL2DAYS began directing customers to send drug payments to a bank account linked to Zelle account with email address praveXXXXX@hotmail.com (H.G.). Drug customers were also given the option to make drug payments to CashApp account $liveteXXXXX (M.S./Cloud 18/H.G.).

73.   In January 2022, PILL2DAYS began directing customers to send drug payments to Venmo account @bx2XX which is controlled by M.P. There was regular communication between M.P. and PILL2DAYS confirming that M.P. had received the drug payments and then directing

M.P. to transfer the drug proceeds to Zelle accounts linked to absolutedigitXXXXX@gmail.com (Entire Solutions, LLC) and praveXXXXX@hotmail.com (H.G.), which are controlled by PILL2DAYS.

74.    M.P. told PILL2DAYS that they were engaging in money laundering and needed to structure the payments to avoid detection by the Internal Revenue Service.

75.    Zelle records and other bank records show the following transactions, among others, of suspected drug proceeds:

A.    Between June 17, 2021, and August 26, 2021, M.P. transferred $1,747.00 (three transactions) to a JPMorgan Chase account linked to A.A. with email address XXXX@vigordose.com.

B.    Between September 10, 2021, and April 30, 2022, M.P. transferred $18,437.11 (twenty-seven transactions) to a JPMorgan Chase account linked to A.A., Entire Solutions, LLC., and email address absolutedigitXXXXX@gmail.com.

C.    Between May 6, 2022, and June 28, 2022, M.P. transferred $12,695.95 (eleven transactions) to Citi Bank account ending in 0104 held in the name of H.G. and listing an email address of praveXXXXX@hotmail.com.

D.    On July 23, 2022, M.P. transferred $2,000.00 (one transaction) to a Wells Fargo account linked to A.A.

E.    Between August 8, 2022, and September 5, 2022, M.P. transferred $12,695.95 (three transactions) to a Navy Federal Credit Union account linked to C.G.

76.    Based on their investigation, agents believe that all of these funds were drug proceeds because all receiving account holders were known co-conspirators and/or controlled bank accounts known to receive and send PILL2DAYS DTO drug proceeds.

77.    Furthermore, the majority of the Zelle transactions contained transaction notes that falsified the purpose of the transactions. For example, M.P. made notes indicating the transactions were for services such as "consulting," "web browser," "search engine optimization," and

"software updates." Based on their investigation, agents believe these falsified notes were made to conceal the purpose of the funds.

**Citi Bank account ending in 0104, from which drug proceeds were transferred to Wells Fargo bank account ending in 7313**

78.     Citi Bank account ending in 0104 ("Citi Bank 0104") is a business account held in the name Live Tech Support, Inc., and the signatory is H.G.

79.     Citi Bank 0104 is an account to which the undercover agents, M.P., and many other PILL2DAYS customers were directed to send drug payments via Zelle.

80.     Approximately $10,000.00 in suspected drug proceeds were transferred from Citi Bank 0104 to Karan Gupta's Wells Fargo account ending in 7313, which funds were later transferred to Karan Gupta's Wealthfront investment account ending in 6673.

81.     According to Citi Bank records, a total of approximately $610,473.18 in suspected drug proceeds were deposited into Citi Bank 0104 between June 2021 and March 2023 and then were transferred out of Citi Bank 0104 to multiple DTO co-conspirator accounts. The majority of deposits were received via Zelle, and another substantial amount was received via a CashApp account being "cashed out" into Citi Bank 0104.

82.     Based on their investigation, agents know that many PILL2DAYS customers were directed to send drug payments to a CashApp account with username $liveteXXXXX – "Cloud 18" and account holder name M.S.

83.     Based on their training and experience and the investigation to date, agents believe that Citi Bank 0104, associated with H.G., was linked to CashApp account $liveteXXXXX.

84.     Furthermore, based on their training and experience and the investigation to date, agents believe that the Zelle and CashApp deposits into Citi Bank 0104 were drug proceeds.

85.     Based on the investigation, agents believe M.S. is a nominee name used on the CashApp account $liveteXXXXX, which is under the control of H.G.  H.G. has Citi Bank account 0104 registered to a similar business name, Live Tech Support, Inc.  In addition, according to Microsoft records, H.G. and M.S. were both affiliated with email address praveXXXXX@hotmail.com, which was used to receive and send drug proceeds via Zelle.

86.     Citi Bank records for account ending in 0104 show the following deposits and withdrawals, among others, of suspected drug proceeds:

A.     Five Zelle deposits from M.S. totaling $17,700.00 (M.S. is the name associated with CashApp account $liveteXXXXX and one of the names listed as a subscriber for email address praveXXXXX@hotmail.com.).

B.     Two Zelle deposits from A.K. totaling $3,000.00 (A.K. had financial transactions with multiple known DTO co-conspirators.).

C.     Three Zelle deposits from the DEA undercover agent totaling $3,550.00 (These undercover payments were for the purchase of controlled substances which were shipped by M.P. and others.).

D.     Nineteen Zelle deposits from M.P. totaling $15,507.95 (M.P. advised agents that M.P. had worked as a drug shipper and payment processor for PILL2DAYS.  M.P. said these payments made to H.G. consisted of customers' drug payments. Zelle records showed that M.P. regularly concealed the purpose of the transactions by claiming the payments were for web design, computer system, consulting, search engine optimization, and more.).

E.     Four Zelle withdrawals sent to P.C. totaling $12,500.00 (PILL2DAYS customers were directed to send drug payments, via Zelle, to an account linked to email address purvika_chauXXXXX@yahoo.in.  Furthermore, M.P. was directed to receive checks in the mail written out to P.C., deposit the checks, and transfer the funds to accounts as directed by PILL2DAYS.).

F.     Seven Zelle withdrawals sent to C.G. totaling $6,682.00 (C.G. is a known drug shipper and payment processor for the PILL2DAYS DTO.  C.G. had shipped a drug parcel to a DEA undercover agent and had shipped multiple suspected drug parcels to M.P.).

G.     Two Zelle withdrawals sent to M.S. totaling $3,500.00 (M.S. is the name associated with CashApp account $liveteXXXXX and Zelle account email

address praveXXXXX@hotmail.com which both received drug payments.).

H.     Twelve Zelle withdrawals sent to A.K. totaling $40,400.00 (A.K. had financial transactions with multiple known DTO co-conspirators.).

I.     Three Zelle withdrawals in June 2022 sent to Karan Gupta totaling $10,000.00 (Karan Gupta is the account holder of Wealthfront investment account ending in 6673.).

J.     Seventeen international withdrawals sent to Indian bank account "Cloud 18 Infotech Private Limited" totaling $140,300.00 ("Cloud18" is a name associated with CashApp account $liveteXXXXX that received customer drug payments.).

K.     Three international withdrawals sent to "Ample Telecommunition Private" totaling $21,500.00. ("Ample Telecommunition Private" was identified by SOI-3 as an Indian bank account used by an Indian call center owner to receive drug proceeds.).

L.     Five international and domestic withdrawals transferred to "Universalnick, LLC" totaling $15,100.00. ("Universalnick, LLC" was identified by SOI-3 as a bank account used by an Argentine national to receive drug proceeds as payment for creating and maintaining websites used to distribute controlled substances.).

M.     One international withdrawal transferred to M.S. totaling $8,000.00. (M.S. is the name associated with CashApp account $liveteXXXXX and Zelle account email address praveXXXXX@hotmail.com which both received drug payments.).

N.     Three international withdrawals transferred to P.K.S. totaling $15,000.00. (P.K.S. is a second subscriber for email address praveXXXXX@hotmail.com which received drug payments via Zelle.)

87.     Based on their training and experience, and the investigation to date, agents believe Citi Bank 0104, registered to the business Live Tech Support, Inc. with signatory H.G., was used to launder drug proceeds as a way to conceal that the funds were derived from drug distribution. In addition, agents know that several of the Zelle deposits falsified the purpose of the deposits into Citi Bank 0104.

**Bank of America account ending in 9115, from which drug proceeds were transferred to Wells Fargo bank account ending in 7313 and Wealthfront investment account ending in 6673**

88.     Bank of America account ending in 9115 ("BOA 9115") lists the sole signatory as Karan Gupta.

89.     Approximately $1,311.00 in suspected drug proceeds were transferred from BOA 9115 to Karan Gupta's Wells Fargo account ending in 7313, which funds were later transferred to Karan Gupta's Wealthfront investment account ending in 6673.

90.     Approximately $3,900.00 in suspected drug proceeds were transferred from BOA 9115 directly to Karan Gupta's Wealthfront investment account ending in 6673. The approximately $83,941.95 seized from Wealthfront 6673 does not include this additional $3,900.00 received from BOA 9115 due to agents learning about the $3,900.00 after Wealthfront restrained and segregated securities valued at approximately $83,941.95 from Wealthfront 6673, pursuant to federal seizure warrant 23-M-511.

91.     Bank of America records from May 2023 through July 2023 for account ending in 9115 show the following deposits totaling approximately $24,102.25 of suspected drug proceeds:

    A.     Multiple Zelle deposits totaling approximately $3,000.00 from K.A. (Zelle deposits were consistent with DTO drug proceeds.).

    B.     One Zelle deposit of $3,500.00 from A.G. (Zelle deposit was consistent with DTO drug proceeds, and A.G. was suspected of regularly transferring drug proceeds to DTO members.).

    C.     One check deposit of $8,602.25 from A.G. (A.G. was suspected of regularly transferring drug proceeds to DTO members.).

    D.     Multiple Zelle deposits totaling approximately $7,500.00 from J.J. (Zelle deposits were consistent with drug proceeds, and J.J. was a known DTO member processing drug payments.).

E.    Multiple Zelle deposits totaling approximately $1,500.00 from K.H. (Zelle deposits were consistent with drug proceeds, and K.H. was a known DTO member processing drug payments.).

92.    Bank of America records from August 2023 through December 2023 for account ending in 9115 show the following deposits totaling approximately $27,734.43 of suspected drug proceeds:

A.    Multiple Zelle deposits totaling approximately $7,000.00 from J.J. (Zelle deposits were consistent with drug proceeds, and J.J. was a known DTO member processing drug payments.).

B.    Multiple Zelle deposits totaling approximately $3,000.00 from K.H. (Zelle deposits were consistent with drug proceeds, and K.H. was a known DTO member processing drug payments.).

C.    One Zelle deposit of $11.00 from Karan Gupta (Zelle deposit consistent with drug proceeds and Karan Gupta is account holder of Wealthfront 6673);

D.    One check deposit of $5,500.00 from Aces Realty Plus. (Aces Realty Plus is a company that many drug customers were directed to send drug payments to via Zelle and M.P. received a check from in the amount of $13,984 to launder);

E.    One Zelle deposit of $1,000.00 from F.F.C. (Zelle deposit consistent with drug proceeds);

F.    Multiple Zelle deposits of $2,891.03 from B.K. (Zelle deposits consistent with drug proceeds);

G.    One Zelle deposit of $1,000.00 from S.A. (Zelle deposit consistent with drug proceeds);

H.    Multiple Zelle deposits of $422.00 from S.J. (Zelle deposits consistent with drug proceeds);

I.    Multiple Zelle deposits of $422.00 from P.J. (Zelle deposits consistent with drug proceeds);

J.    Multiple Zelle deposits of $4,800.40 from N.G. (Zelle deposits consistent with drug proceeds);

K.      Multiple Zelle deposits of $422.00 from N.V. (Zelle deposits consistent with drug proceeds);

L.      Multiple Zelle deposits of $422.00 from V.P. (Zelle deposits consistent with drug proceeds);

M.      Multiple Zelle deposits of $422.00 from D.B. (Zelle deposits consistent with drug proceeds);

N.      One Zelle deposit of $250.00 from Wajiha Tareen Real Estate Expert Inc. (Zelle deposit consistent with drug proceeds); and

O.      One Zelle deposit of $172.00 from W.K. (Zelle deposit consistent with drug proceeds).

93.      Based on their training and experience, and the investigation to date, agents believe BOA 9115 with sole signatory Karan Gupta was used to launder drug proceeds as a way to conceal that the funds were derived from drug distribution.

94.      On January 18, 2024, the United States obtained a seizure warrant (24-MJ-32), issued by United States Magistrate Judge William Duffin in the Eastern District of Wisconsin, to seize up to $51,836.28 in drug proceeds on deposit in BOA 9115.  Agents did seize the account balance of $50,081.78.

**Bank of America account ending in 6857, from which drug proceeds were transferred to Wells Fargo bank account ending in 7313**

95.      Bank of America account ending in 6857 ("BOA 6857") lists the signatories as Karan Gupta and E.G.

96.      Approximately $28,050.00 in suspected drug proceeds were transferred from BOA 6857 to Karan Gupta's Wells Fargo account ending in 7313, which funds were later transferred to Karan Gupta's Wealthfront investment account ending in 6673.

97. Bank of America records from July 19, 2021, through September 27, 2022, for account ending in 6857 reflect deposits from an unidentified Karan Gupta account, Zelle deposits from various senders consistent with drug payments, and potential payroll payments.

98. Based on their training and experience, and the investigation to date, agents believe BOA 6857 with signatories Karan Gupta and E.G. was used to launder drug proceeds as a way to conceal that the funds were derived from drug distribution.

**Wells Fargo bank account ending in 7313 held in the name of Karan Gupta, from which drug proceeds were transferred to Karan Gupta's Wealthfront investment account ending in 6673**

99. Karan Gupta is the sole signatory on Wells Fargo bank account ending in 7313 ("Wells Fargo 7313").

100. According to Wells Fargo bank records from June 2021 through June 2023, numerous deposits, primarily Zelle deposits, totaling approximately $83,941.95 were deposited into Wells Fargo 7313 before they were transferred into Wealthfront investment account ending in 6673 held in the name of Karan Gupta.

101. The deposits into Wells Fargo 7313 totaling approximately $83,941.95 in drug proceeds from the PILL2DAYS DTO included the following:

A. Multiple Zelle deposits totaling approximately $1,311.00 from Bank of America account ending in 9115 held in the name of Karan Gupta (Bank of America 9115 received suspected drug proceeds from known DTO members.).

B. Multiple Zelle deposits totaling approximately $28,050.00 from Bank of America account ending in 6857 held in the names of Karan Gupta and E.G. (Bank of America 6857 was used to receive Zelle deposits from another Karan Gupta account and Zelle deposits from various senders consistent with drug payments.).

C. Multiple Zelle deposits totaling approximately $10,000.00 from H.G.'s Citi Bank account ending in 0104 (Zelle deposits were consistent with drug proceeds, and H.G. is a known drug payment processor for the DTO.).

D.     Multiple Zelle deposits totaling approximately $170.00 from G.A. (Zelle deposits were consistent with drug proceeds.).

E.     Multiple wire transfers totaling approximately $6,480.29 from G.A. (G.A. was responsible for making Zelle deposits consistent with drug proceeds, and these wire transfers were also consistent with drug proceeds transactions.).

F.     Multiple Zelle deposits totaling approximately $17,500.00 from Anco Creations (Zelle deposits were consistent with drug proceeds, and Anco Creations is another business account held by Karan Gupta.).

G.     One Zelle deposit of approximately $39.66 from B.R.R.S. (Zelle deposit was consistent with drug proceeds.).

H.     One Zelle deposit of approximately $150.00 from Ark Logistics (Zelle deposit was consistent with drug proceeds.).

I.     Multiple Zelle deposits totaling approximately $3,521.00 from J.J. (Zelle deposits were consistent with drug proceeds, and J.J. is a known DTO member who processed drug payments.).

J.     One Zelle deposit of approximately $279.00 from P.D. (Zelle deposit was consistent with drug proceeds, and P.D. had transferred Zelle payments to other DTO members.).

K.     Multiple Zelle deposits totaling approximately $3,745.00 from A.B. (Zelle deposits were consistent with drug proceeds.).

L.     Multiple Zelle deposits totaling approximately $505.00 from N.G. (Zelle deposits were consistent with drug proceeds.).

M.     One Zelle deposit of approximately $1,200.00 from J.M. (Zelle deposit was consistent with drug proceeds, and J.M. had transferred Zelle payments to other DTO members.).

N.     Multiple Zelle deposits totaling approximately $3,040.00 from A.G. (Zelle deposits were consistent with drug proceeds.).

O.     Multiple Zelle deposits totaling approximately $1,801.00 from R.P. (Zelle deposits were consistent with drug proceeds.).

P.     One Zelle deposit of approximately $900.00 from S.S. (Zelle deposit was consistent with drug proceeds.).

Q. One Zelle deposit of approximately $250.00 from K.B. (Zelle deposit was consistent with drug proceeds.).

R. Multiple Zelle deposits totaling approximately $5,000.00 from A.C. (Zelle deposits were consistent with drug proceeds.).

102. Based on their investigation, agents believe the approximately $83,941.95 in deposits into Wells Fargo 7313 constitutes drug proceeds from the PILL2DAYS DTO.

103. Based on their investigation, agents further believe that Wells Fargo 7313 was used to launder PILL2DAYS' drug proceeds as a way to conceal that the funds were derived from drug distribution.

**Wealthfront investment account ending in 6673 held in the name of Karan Gupta, into which drug proceeds were transferred from Karan Gupta's Wells Fargo bank account ending in 7313**

104. Karan Gupta is the sole account holder of Wealthfront investment account ending in 6673 ("Wealthfront 6673").

105. According to Wealthfront records from July 2021 through July 2023, a total of approximately $83,941.95 was transferred in small increments from Karan Gupta's Wells Fargo 7313 into Karan Gupta's Wealthfront 6673.

106. Based on the investigation described above, agents believe that Karan Gupta, H.G., M.P., C.G., and others were involved in a drug trafficking organization that imported bulk drug parcels from overseas to United States drug shippers working for online pharmacies, including PILL2DAYS. These drugs were then reshipped throughout the United States to customers by M.P., C.G., and others.

107. Based on the investigation described above, agents identified a series of bank accounts controlled by Karan Gupta and H.G. that were used to receive drug payments from the PILL2DAYS DTO and to launder those illicit funds.

108. Based on the investigation described above, agents traced deposits totaling approximately $83,941.95 in drug proceeds into Wealthfront investment account ending in 6673 held in the name of Karan Gupta.

109. Based on the investigation described above, the approximately $83,941.95 in drug proceeds was transferred from various accounts into Karan Gupta's Wells Fargo 7313, and then from Wells Fargo 7313 into Karan Gupta's Wealthfront 6773 as a way to conceal that the funds were derived from drug distribution.

**Warrant for Arrest In Rem**

110. Upon the filing of this complaint, the plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the defendant property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

**Claim for Relief**

111. The plaintiff repeats and incorporates by reference the paragraphs above.

112. By the foregoing and other acts, the defendant property, all securities in Wealthfront account number 8W14BX2M, represents (1) proceeds of distribution of controlled substances and a conspiracy to distribute, manufacture, dispense, or possess with the intent to manufacture, distribute, or dispense controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and (2) proceeds of distribution of controlled substances by means of the Internet and a conspiracy to deliver, distribute, or dispense controlled substances by means of the Internet, in violation of 21 U.S.C. §§ 841(h), 843(c)(2)(A), and 846.

113. The defendant property, all securities in Wealthfront account number 8W14BX2M, is therefore subject to forfeiture to the United States of America under 21 U.S.C. § 881(a)(6).

114. By the foregoing and other acts, the defendant property, all securities in Wealthfront account number 8W14BX2M, was involved in, or is traceable to funds involved in, money laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957.

115. The defendant property, all securities in Wealthfront account number 8W14BX2M, is therefore subject to forfeiture under 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that a warrant of arrest for the defendant property be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment declare the defendant property to be condemned and forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

Dated at Milwaukee, Wisconsin, this 19th day of November, 2024.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:  *s/Elizabeth M. Monfils*
ELIZABETH M. MONFILS
Assistant United States Attorney
Wisconsin Bar No. 1061622
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Avenue, Room 530
Milwaukee, WI 53202
Telephone: (414) 297-1700
Fax: (414) 297-1738
E-Mail: elizabeth.monfils@usdoj.gov

**Verification**

I, Bryan Ayers, hereby verify and declare under penalty of perjury that I am a Special Agent with the Drug Enforcement Administration ("DEA"), that I have read the foregoing Verified Complaint for Civil Forfeiture *in rem* and know the contents thereof, and that the factual matters contained in paragraphs 14 through 109 of the Verified Complaint are true to my own knowledge.

The sources of my knowledge are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with the DEA.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Date: 11/19/24

*s/Bryan Ayers*
Bryan Ayers
Special Agent
Drug Enforcement Administration